# No. 23-50731

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LUIS MANUEL BANUELOS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Brief of Defendant-Appellant**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

BRADFORD W. BOGAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## Certificate of Interested Persons

### UNITED STATES v. LUIS MANUEL BANUELOS, No. 23-50731

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Luis Manuel Banuelos,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley C. Hoff,** former U.S. Attorney;

4. **Patricia J. Acosta, Victoria S. Crosby, Lori Hughes, Susanna Martinez,** and **Gregory E. McDonald,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Alejandro R. Almanzan,** Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

7. **Bradford W. Bogan,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Bradford W. Bogan
BRADFORD W. BOGAN
*Attorney for Defendant-Appellant*

i

## Statement Regarding Oral Argument

Banuelos argues that the statute under which he was convicted—18 U.S.C. § 922(g)(1), which bars convicted felons from possessing firearms—violates the Second Amendment. This issue would benefit from oral argument because it involves an intervening Supreme Court decision—*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)—that abrogates this Court's precedent.[1]

---

[1] Banuelos is aware of at least seven cases pending in this Court in which the same issue was preserved below: *United States v. Charles*, No. 23-50131 (set for oral argument on February 7, 2024); *United States v. Collette*, No. 22-51062 (briefing complete; placed in abeyance pending decision in *United States v. Rahimi*, No. 22-915 (U.S.)); *United States v. Melendrez-Machado*, No. 23-50506 (same); *United States v. Grinage*, No. 23-50261 (briefing complete); *United States v. Bullock*, No. 23-60408 (briefing complete); *United States v. Mireles*, No. 23-50601 (briefing complete).

# Table of Contents

Certificate of Interested Persons......................................................i

Statement Regarding Oral Argument..............................................ii

Table of Authorities.......................................................... iv

Subject Matter and Appellate Jurisdiction ..................................... 1

Issue Presented for Review ............................................................ 2

Statement of the Case........................................................... 3

Summary of the Argument ............................................................ 6

Argument and Authorities............................................................. 8

    Section 922(g)(1) violates the Second Amendment.................... 8

    A. Standard of review. ............................................................. 8

    B. *Bruen* abrogated the Second Amendment framework previously employed by circuit courts after *Heller*. ............. 9

        1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm. ............................................................11

        2. Felons are among "the people" protected by the Second Amendment. ..................................................... 12

        3. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." ....................................................... 16

    C. Under the same framework, § 922(g)(1) violates the Second Amendment as applied to felons like Banuelos..... 34

Conclusion................................................................... 37

Certificate of Compliance with Type-Volume Limit...................... 38

# Table of Authorities

## Cases

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................*passim*

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ........................................................ 9

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ..................................................9, 10, 11, 14

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ........................................ 29, 32, 33

*Nat'l Rifle Ass'n of Am., Inc. v.*
  *Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  700 F.3d 185 (5th Cir. 2012) ..................................................9, 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022)..........................................................*passim*

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) ................................................................... 19

*Range v. Att'y Gen.,*
  69 F.4th 96 (3d Cir. 2023) (en banc) ...................................*passim*

*Scarborough v. United States,*
  431 U.S. 563 (1977) ................................................................... 29

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011)................................................... 28, 29

*United States v. Bullock,*
  2023 WL 4232309 (S.D. Miss. June 28, 2023) .......................... 35

*United States v. Daniels,*
  77 F.4th 337 (5th Cir. 2023) ................................................*passim*

*United States v. Massey,*
  849 F.3d 262 (5th Cir. 2017) ....................................................... 8

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) .................................................. 9, 10

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023) .................................................*passim*

*United States v. Sitladeen,*
  64 F.4th 978 (8th Cir. 2023) ..................................................... 15

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ..................................................... 30

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990) ................................................................ 13

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010) ..................................................... 29

**Constitutional Provisions**

U.S. Const. amend. I ................................................................ 13

U.S. Const. amend. II ...................................................6, 9, 11, 13

U.S. Const. amend. IV ............................................................. 13

U.S. Const. amend. IX .............................................................. 13

**Statutes**

18 U.S.C. § 3231.................................................................... 1

18 U.S.C. § 3742(a) ................................................................ 1

18 U.S.C. § 922 ..................................................................... 28

18 U.S.C. § 922(g)(1) ........................................................*passim*

28 U.S.C. § 1291.................................................................... 1

1671 Game Act ................................................................ 21

Act of May 8, 1792,
   1 Stat. 271 .............................................................. 27

Act of Oct. 3, 1961,
   Pub. L. No. 87-342, 75 Stat. 757 ................................. 25

Constitution and Laws of the State of New-Hampshire,
   Act of Dec. 28, 1792 (1805) ........................................ 27

Federal Firearms Act of 1938,
   75 Cong. Ch. 850, § 2(e), 52 Stat. 1250 ...................... 25

Gun Control Act of 1968,
   Pub. L. 90-618, 82 Stat. 1213 .................................... 25

Herty, Digest of the Laws of Maryland,
   "Militia," §§ 7, 15, 19, 20 (1799) ............................... 27

Laws of the State of Delaware,
   ch. XXXVI, §§ 1, 2, 4 (1797) ...................................... 27

Marbury, Digest of the Laws of the State of Georgia,
   Act of December 24, 1792, §§ 9–10 (1802) ................. 27

Militia Act of 1662 ......................................................... 21

Mitchell, Statutes at Large of Pennsylvania,
   Act of March 20, 1780, §§ III, XXI (1700–1809) ........ 27

Public Statute Laws of the State of Connecticut,
   Title CXII, ch. I, §§ 1, 10 (1808) ............................... 27

Thomas Greenleaf, Laws of the State of New-York,
   Act of April 4, 1786 (1792) ......................................... 27

Wright & Potter, 7 Acts and Laws
   of the Commonwealth of Massachusetts, 1780–1805, ch. 14
   (1898) ....................................................................... 27

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ............................................................ 1

Fed. R. App. P. 32(a)(5) ................................................................ 38

Fed. R. App. P. 32(a)(6) ................................................................ 38

Fed. R. App. P. 32(a)(7)(B) ............................................................ 38

Fed. R. App. P. 32(f) .................................................................... 38

**Other Authorities**

Adam Winkler,
  *Heller's Catch-22*,
  56 UCLA L. Rev. 1551 (2009) ......................................... 25, 28, 30

Alice Ristroph,
  *The Second Amendment in a Carceral State*,
  116 Nw. U. L. Rev. 203 (2021) ........................................... 21

C. Kevin Marshall,
  *Why Can't Martha Stewart Have A Gun?*,
  32 Harv. J.L. & Pub. Pol'y 695 (2009) ...................................... 28

Carlton F.W. Larson,
  *Four Exceptions in Search of A Theory:*
  District of Columbia v. Heller *and Judicial Ipse Dixit*,
  60 Hastings L.J. 1371 (2009) ............................................... 28

Joseph G. S. Greenlee,
  *The Historical Justification for Prohibiting Dangerous Persons
  from Possessing Arms*,
  20 Wyo. L. Rev. 249 (2020) ...............................................*passim*

Nelson Lund,
  *The Second Amendment,* Heller*, and Originalist Jurisprudence*,
  56 UCLA L. Rev. 1343 (2009) ............................................... 25

Robert H. Churchill,
   *Gun Regulation, the Police Power,*
   *and the Right to Keep Arms in Early America,*
   25 Law & Hist. Rev. 139 (2007)...................................... 22, 24, 32

## Subject Matter and Appellate Jurisdiction

**1.  Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2.  Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas entering a judgment of criminal conviction and sentence. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). Banuelos's judgment was entered on October 11, 2023. ROA.9. Banuelos filed a notice of appeal the next day, on October 12, 2022. ROA.9, 199.

1

## Issue Presented for Review

Is 18 U.S.C. § 922(g)(1), which categorially bars all convicted felons (meaning those convicted of "a crime punishable by imprisonment for a term exceeding one year") from possessing firearms, unconstitutional under the Second Amendment?

## Statement of the Case

Banuelos was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He argues that the district court erred by denying his motion to dismiss the indictment because the statute is unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

1. Banuelos is a convicted felon. In 2006, he was placed on six years' deferred adjudication for possessing between 50 and 2,000 pounds of marijuana. ROA.170, 271. In 2008, the state court adjudicated Banuelos guilty of that offense and sentenced him to eight year's imprisonment. ROA.170, 272. Banuelos also has a prior conviction for criminal trespass, for which he was sentenced to 100 days' custody, and convictions for driving infractions (driving without a license and speeding), for which he was fined. ROA.272–74.

In this case, customs agents found a pistol in Banuelos's truck when he arrived at a port of entry in El Paso, Texas, on his way back to the United States from Juarez, Mexico. ROA.267–68. He was charged in a one-count indictment with violating § 922(g)(1) by being a felon in possession of the firearm. ROA.22.

2. Banuelos moved to dismiss the indictment, arguing that "§ 922(g)(1) is unconstitutional under the Second Amendment, both facially and as applied to [him], under the new standard announced by the Supreme Court in *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2002)." ROA.70. He argued that the charged conduct—possession of a firearm commonly used for self-defense— is protected by the plain text of the Second Amendment. ROA.73– 76; *see* ROA.136–40. The statute is facially unconstitutional, Banuelos argued, because the Government cannot satisfy its burden, under *Bruen*, of establishing that § 922(g)(1) is consistent with the Nation's history of firearm regulation. ROA.77–80; *see* ROA.140– 46. Alternatively, Banuelos argued that § 922(g)(1) is unconstitutional as applied to him because his criminal history does not suggest that he is dangerous and his prior felony (possession of marijuana) is not a serious crime. ROA.80–83; *see* ROA.146–49.

The district court denied Banuelos's motion to dismiss. ROA.221–31. In denying Banuelos's facial challenge, the court concluded that barring felons from possessing firearms is consistent with the Nation's historical tradition of disarming "unvirtuous citizens." ROA.160–63. The court rejected Banuelos's as-applied challenge for the same reason it rejected his facial challenge. ROA.163.

3. To preserve his ability to challenge the denial of his motion to dismiss on appeal, Banuelos proceeded to a stipulated bench trial. ROA.172, 204–09. The parties submitted a written "Stipulation of Facts" establishing the elements of § 922(g)(1). ROA.170–71, 207–09. The Stipulation, which the Government read aloud at the bench trial, provided that it "does not foreclose [Banuelos's] right to appeal his conviction" and that Banuelos "explicitly reserves his right to appeal the Court's Order denying his Motion to Dismiss the Indictment." ROA.171, 209. The district court found Banuelos guilty. ROA.192, 209.

4. The district court sentenced Banuelos to 21 months' imprisonment, to be followed by three years' supervised release. ROA.193–94.

5. Banuelos appealed. ROA.199.

## Summary of the Argument

**Section 922(g)(1) violates the Second Amendment.**

Banuelos's conviction for being a felon in possession of a firearm should be reversed because 18 U.S.C. § 922(g)(1) unconstitutionally infringes on his rights under the Second Amendment, both facially and as applied to him. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. 142 S. Ct. 2111, 2156 (2022). The Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, it announced that a modern firearm regulation's constitutionality depends only on the Second Amendment's text and historical understanding.

Under this new framework, 18 U.S.C. § 922(g)(1) violates the Second Amendment. The statute impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including felons. And the Government cannot meet its burden to show § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation,

because there is no relevant historical evidence of categorically dis-
arming felons.

## Argument and Authorities

## Section 922(g)(1) violates the Second Amendment.

The district court erred by denying Banuelos's motion to dismiss the indictment. Section 922(g)(1) criminalizes firearm possession by any person convicted of a crime punishable by more than a year in prison. This Court has repeatedly held that § 922(g)(1) does not violate the Second Amendment. *See, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017). But those decisions pre-date *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which announced a new framework for analyzing Second Amendment claims. *Bruen* is an intervening Supreme Court decision that has implicitly overruled this Court's precedent because it "fundamentally change[d] the focus of the relevant analysis." *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023) (cleaned up). This Court should apply *Bruen* and hold § 922(g)(1) unconstitutional both facially and as applied to Banuelos.

### A. Standard of review.

The Court reviews constitutional challenges to a statute *de novo. See United States v.* Daniels, 77 F.4th 337, 341 (5th Cir. 2023), *petition for cert. filed* (U.S. Oct. 5, 2023) (No. 23-376); *United States*

*v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023).

**B. *Bruen* abrogated the Second Amendment framework previously employed by circuit courts after *Heller*.**

The Second Amendment to the United States Constitution mandates that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008), the Supreme Court held that the Second Amendment codifies an individual right to possess firearms, the "central component" of which is self-defense. *See Bruen*, 142 S. Ct. at 2133 (citing *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). This involved determining "whether the law

9

harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id*. Otherwise, courts proceeded to the second step, to determine whether to apply strict or intermediate scrutiny. *Id*. That means-end framework has now been repudiated by the Supreme Court. *See Bruen*, 142 S. Ct. at 2127; *see also Rahimi*, 61 F.4th at 450.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims, abrogating the two-step inquiry adopted by this Court and others. *Bruen* rejected the second step of that framework because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. *Bruen* reasoned that "[s]tep one of the predominant framework is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."

*Id.* Only then may a court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Id.*

### 1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1): possession of a firearm.

Section 922(g)(1) permanently disqualifies all felons from exercising the fundamental right to possess firearms for self-defense. The district court correctly concluded that Banuelos's conduct in possessing a firearm is covered by the plain text of the Second Amendment. ROA.158–60. As a result, § 922(g)(1) is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment protects "the right of the people to keep and bear Arms ...." U.S. Const. amend. II. The plain text—"keep and bear arms"—means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, without regard to the type of firearm or the way it is used. It therefore infringes upon the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also Rahimi*, 61 F.4th at 454

(possession of rifles and pistols, weapons "in common use today," "easily falls within the purview of the Second Amendment").

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. 142 S. Ct. at 2126. Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

## 2. Felons are among "the people" protected by the Second Amendment.

The Second Amendment covers felons by recognizing that the right to keep and bear arms belongs to "the people." U.S. Const. amend. II. The plain text does not limit who is included in "the people." *See id.* The text simply says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *Id*. The Supreme Court has confirmed that "'the Second Amendment right is exercised individually and belongs to *all* Americans.'" *Daniels*, 77 F.4th at 342 (quoting *Heller*, 554 U.S. at 581, and adding emphasis). So whether a category of person can be disarmed is a question of historical tradition and falls under the second *Bruen* step, not the Second Amendment's plain text.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—*i.e.*, those in a militia. 554 U.S. at 579–81, 592–600. *Heller* explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

Like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. This is distinguishable from other Constitutional provisions for "collective" actions by "the people," like voting, which enumerate the civic exercise of powers, not rights. *Id.* Individual rights extend to "the people," or a "'class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community.'" *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Categorically excluding felons from the plain text of the Second Amendment would, therefore, endanger felons' basic protections under the First and Fourth Amendments. *Range v. Att'y Gen.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (en banc). It also would run afoul of *Bruen*'s

directive that the Second Amendment is "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.))

One sitting Justice has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the existence of the right. In *Kanter v. Barr*, then-Judge Barrett observed that, under *Heller*, the word "people" refers to "all Americans," meaning that felons are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). The "question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id*. Thus, a person's status as a felon is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Id.* at 451–52.

This Court has now twice rejected the Government's attempts to limit "the people" protected by the Second Amendment to only "law-abiding, responsible citizens." *See Daniels*, 77 F.4th at 342–43; *Rahimi*, 61 F.4th at 451–53. While acknowledging the Supreme Court's use of the term "law-abiding, responsible citizens," *Daniels*

14

explained that "we cannot read too much into the Supreme Court's chosen epithet." 77 F.4th at 342; *see also Range*, 69 F.4th at 101 (noting that the references to "law-abiding, responsible citizens" in *Heller*, *McDonald*, and *Bruen* were dicta).

This Court reiterated *Heller*'s conclusion that the Second Amendment right "belongs to all Americans." *Daniels*, 77 F.4th at 342; *Rahimi*, 61 F.4th at 451–52. The Court also endorsed Justice Barrett's reasoning in *Kanter v. Barr* that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Daniels*, 77 F.4th at 343 & n.2; *Rahimi*, 61 F.4th at 452–53; *see also United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023) (reading *Rahimi* to require consideration of a person's status at the historical, second step of *Bruen*). Indeed, *Daniels* discusses the historical "strip[ping]" of rights, not the absence of rights. 77 F.4th at 343. Both longstanding prohibitions and groups historically stripped of their rights involve a historical analysis. Any alternative reading would contradict *Rahimi*'s and *Daniels*'s reiteration of *Heller*, endorsement of Justice Barrett's approach in *Kanter*, and rejection of the "law-abiding" gloss proffered by the Government below. *See Daniels*, 77 F.4th at 342–43; *Rahimi*, 61 F.4th at 451–53.

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, § 922(g)(1)'s categorical ban on an individual's possession of a firearm based on their status as a felon is presumptively unconstitutional under the plain text of the Second Amendment at the first stage of the *Bruen* analysis. Whether a category of people can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

### 3. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."

Because the plain text of the Second Amendment covers § 922(g)(1), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *Bruen* described three metrics by which the sufficiency of the historical precedent should be analyzed: temporal proximity to the founding era, similarity to the challenged restriction, and breadth. *Id.* at 2130–34, 2136, 2138.

*First*, regarding temporal proximity to the founding era, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S.

Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35; emphasis in *Bruen*). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years."[2] *Id*. Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id*. The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id*. at 2137.

*Second*, the founding-era historical precedent must be comparable to the challenged regulation. How similar the historical precursors must be to the challenged law depends on the societal problem

---

[2] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's protections on a state regulation or law. The Supreme Court did not hold that, for a challenge to a federal statute, regulations from around the passage of the Fourteenth Amendment (1868) would carry the same weight as those from around ratification of the Second Amendment (1791). *See Bruen*, 142 S. Ct. at 2137–38; *see also id*. at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id*. at 2137, and its value is even more limited when addressing a federal statute.

it seeks to address. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the Government must identify distinctly similar historical regulations. *Bruen*, 142 S. Ct. at 2131. The "lack of a distinctly similar historical regulation addressing that problem" or evidence that earlier generations addressed the societal problem through materially different means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* The total handgun ban in *Heller* and public-carry restriction in *Bruen* involved this type of "straightforward" historical inquiry. *Id.*

*Bruen*'s historical analysis demonstrates that "distinctly similar" means the regulations are nearly identical or meaningfully the same. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy ...." *Id.* Whether a historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id.* at 2132–33. But this "nuanced approach"

only applies to "modern regulations that were unimaginable at the founding." *Id.* at 2132. As this Court phrased the inquiry in *Rahimi*, regarding a different provision in § 922(g), whether the historical precedents are "relevantly similar" depends on a comparison of how the laws restricted the right to bear arms and why the burden was so placed, neither requiring a "historical twin" nor accepting an analogue that "remotely resembles" current law but "risks endorsing outliers that our ancestors never would have accepted." *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132–33).

*Third*, the Government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Bruen*, 142 S. Ct. at 2138. In other words, the founding-era historical evidence must show "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). The Government cannot "simply posit that the regulation promotes an important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, *Bruen* "doubt[ed] that *three* colonial regulations could suffice to show a tradition." *Id.* at 2142. Moreover, it

is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id.* at 2130 n.6, 2150.

The Government cannot meet its burden here because there is no historical tradition, particularly from the founding era, of disarming all felons.

### a. The history of categorical firearms restrictions does not support disarming felons.

Reviewing historical examples of categorical restrictions on firearm possession—*i.e.*, wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis of temporal proximity to the founding era, similarity to the challenged restriction, and breadth. While there is some limited historical evidence of disarming certain specific categories of people, none support finding § 922(g)(1) constitutional.

Historical analyses of firearms rights and regulations generally begin with pre-founding English common law, though *Bruen* cautions against placing undue emphasis on English laws, particularly laws that long predate this Nation's founding. *See Bruen*, 142 S. Ct. at 2138–39. As early as the 15th and 16th centuries, English law targeted potentially disloyal communities, including Catholics and

the Welsh, for disarmament. *See* Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257–65 (2020). In the Restoration period following the English Civil War of the mid-17th century, the Stuart monarchs more aggressively disarmed political and religious dissidents. *See Heller*, 554 U.S. at 592–93. For example, the Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom;" the 1671 Game Act involved disarmament of those who did not own property, particularly in Protestant regions; and forfeiture of "armour" could be ordered for those who went "armed to terrify the King's subjects." *Id.*; *see Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

Following the Glorious Revolution in 1688, a Convention of elected representatives drafted the Declaration of Rights—a predecessor to the Second Amendment codified as the English Bill of Rights—which included that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *See Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021). Almost immediately thereafter, Parliament began disarming Catholics viewed as potential dissidents. *See Heller*, 554 U.S. at

593. Indeed, through the 18th century, England targeted "papists and other disaffected persons, who disown his Majesty's government," for disarmament, to quell concerns over potential rebellions and insurrections. *See* Greenlee at 260–61. The most discernable English tradition prior to American independence was the disarmament of religious dissidents perceived as threatening to the crown. *See id.* at 257–61.

In the American colonies during the 17th and 18th centuries, categorical disarmament was largely reserved for Indians, indentured servants, slaves, black freedmen, and others outside of the "body politic." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 156–58 (2007). Scholars have likewise recognized a trend of disarming individuals who voluntarily excluded themselves from that "body politic" by refusing to swear allegiance, first to the crown, and later to the American Revolution and newly established states and commonwealths. *Id.* at 157–61. As in England, the colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Greenlee at 263.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal colonists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554 U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id.* at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself.[3] *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

---

[3] In *Rahimi*, this Court rejected the use of many of these historical English and colonial era laws with regard to the restriction on possession of firearms by those subject to protective orders, but did so by focusing on the clear dissimilarities between those laws and that specific provision, including that these earlier English and colonial-era laws were targeted at preserving the social and political order generally, and not at the protection of individuals by the threat posed by another, and that other laws proffered by the Government were based on criminal proceedings rather than the civil proceedings underlying § 922(g)(8)'s prohibition. 61 F.4th at 457.

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. *See* Greenlee at 268–70. For example, some religious dissidents in the Massachusetts Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id.*

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," or on targeted disfavored groups like "tramps." Greenlee at 269–70. But these prohibitions, like earlier laws, did not disarm felons as a class. After a full survey of printed session laws on gun regulation, history professor Robert H. Churchill concluded: "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142, 143 n.11.

It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including on felons. *See* Greenlee at 272–75. Congress passed the first version of the modern federal firearm ban for violent felons in 1938, expanding it to include non-violent felons in 1961 and all possession in 1968.[4] State laws disarming felons were, likewise, first adopted in the early 20th century. *See* Adam Winkler, *Heller's Catch-22,* 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

A brief review of English and early American historical categorical firearms restrictions evinces a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive regulations, rather than an endorsement of such categorical restrictions. But insofar as

---

[4] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

the United States incorporated any tradition of categorical exclusion, it assuredly did not include the targeted disarmament of felons until the 20th century.

### b. There is no evidence of "distinctly similar" founding-era regulations disarming all felons.

Turning to the *Bruen* framework, the Government must provide historical examples of regulations that are "distinctly similar" to § 922(g)(1) because, as in *Heller* and *Bruen*, the restriction does not address "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132–33. Section 922(g)(1) categorically bans firearm possession by all felons. Crime and felons have existed since the founding. So too has the presumed "societal concern" addressed by § 922(g)(1): felons possessing firearms. The Government cannot therefore rely on the "nuanced approach" of "analogical reasoning" using "relevantly similar" analogues. *See Bruen*, 142 S. Ct. at 2132. The "relevantly similar" inquiry is reserved for statutes addressing uniquely modern problems that would have been "unimaginable" at the founding. *See id*.

There are no "distinctly similar" founding-era laws demonstrating a tradition of broadly prohibiting firearm possession by felons.[5] *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting scholars have not been able to identify any founding-era laws disarming all

---

[5] To the contrary, there is considerable evidence that felons were included among those citizens to whom the Second Amendment was expressly directed. Even though the right protected by the Second Amendment "does not depend on service in the militia[,]" *Bruen*, 142 S. Ct. at 2127, it must extend to at least the pool of individuals from whom the militia would be drawn. And in the founding era, felons were part of the militia pool. Just one year after the ratification of the Second Amendment, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act "exempted" certain class of people, but not felons. *Id.* § 2, 1 Stat. 272. Similar contemporaneous state militia statutes also failed to exempt felons. *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134–36 (1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367–70 (1799); Wright & Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780–1805, ch. 14, at 381–82, 389–90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251–52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227–28, 232–33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700–1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9–10, at 350 (1802).

felons); *see also* Winkler at 1563 ("The Founding generation had no laws … denying the right to people convicted of crimes."). The earliest firearm restrictions for felons in America were passed in the 20th century. *See, e.g.*, Greenlee at 272–75; C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) ("As far as I can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century. The earliest such law was enacted in New York in 1897, and similar laws were passed by Illinois in 1919, New Hampshire, North Dakota, and California in 1923, and Nevada in 1925.").

The modern statutes that dispossess felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196. Reliance on the passage of § 922 itself to support its own

historical tradition is logically circular and ignores *Bruen*'s skepticism of 20th century historical evidence. *See Bruen*, 142 S. Ct. at 2137, 2154 n.28; *cf. Scarborough v. United States*, 431 U.S. 563, 569 (1977) (§ 922(g)(1)'s predecessor "was a last-minute amendment to the Omnibus Crime Control Act enacted hastily with little discussion and no hearings.").

Before *Bruen*, courts often acknowledged the absence of founding-era felony restrictions. Yet they concluded that § 922(g)(1) was constitutional by relying on *Heller*'s dicta that prohibitions on felon firearm possession were "longstanding," or by applying means-end scrutiny that *Bruen* swept aside. *See, e.g., Booker*, 644 F.3d at 24 (noting that *Heller*, 554 U.S. 626–27 & n.16 did not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful)); *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (same); see also *United States v. Williams*, 616 F.3d 685, 691–94 (7th Cir. 2010) (holding that § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny).

This reasoning is irreconcilable with the framework laid out in *Bruen*, which expressly rejected the use of means-end scrutiny.

*Bruen*, 142 S. Ct. at 2127–30. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts have cautioned against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also* Winkler at 1567. *Bruen* requires the Government to provide "distinctly similar" historical examples from the founding era to prove that a restriction on the Second Amendment right is consistent with the Nation's traditions. *See generally Bruen*, 142 S. Ct. 2111. *Heller* did not provide the historical basis for its "longstanding prohibitions" dicta, and *Bruen* acknowledged as much. *See Bruen*, 142 S. Ct. at 2128 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment"). *Bruen* did not carve out an exception to its framework for firearm restrictions for felons.[6] Courts are simply not permitted to disregard the framework laid out in

---

[6] *Bruen*'s majority opinion is silent about this issue. Justice Kavanaugh, in a concurring opinion joined by Chief Justice Roberts, cited the "longstanding prohibitions" language from *Heller*. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Justice Alito also noted in a concurrence that the opinion did not disrupt the holdings of *Heller*. *Id.* at 2157 (Alito, J., concurring). But neither concurrence announced that § 922(g)(1) is constitutional or subject to a relaxed Second Amendment analytical framework.

*Bruen* based on dicta from *Heller*. If categorical prohibitions for felons are indeed "longstanding" and satisfy the newly articulated framework in *Bruen*, the Government would be able to identify specific "distinctly similar" historical examples of such a tradition. But it cannot.

The absence of founding-era laws specifically disarming felons forecloses the Government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(1).

### c. The Government cannot satisfy the "relevantly similar" inquiry either.

In *Rahimi*, this Court appeared to adopt the "relevantly similar" standard for all forms of firearm regulation, regardless of whether the societal problem was of a long-standing nature. *See Rahimi*, 61 F.4th at 455–60. Even if the Court applied this more "nuanced approach," which should be reserved under *Bruen* for statutes addressing unprecedented modern problems, there is no evidence of "relevantly similar" firearms restrictions to § 922(g)(1) from the founding era. Courts that have upheld § 922(g)(1) since Bruen have largely eschewed the requirement to show specific similar historical regulations. Instead, many have relied on general arguments by the

Government that § 922(g)(1) is consistent with traditions of disarming other "unvirtuous" citizens. This is inconsistent with *Bruen*.

Even prior to *Bruen*, some courts relied on a purported tradition of disarming "unvirtuous" citizens to support modern felon disarmament laws. *See Medina*, 913 F.3d at 159 (collecting cases). Scholars have, however, noted the absence of historical support for this "virtuous citizen" theory. *See Greenlee* at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id*. Rather, as described above, historical categorical disarmament was generally limited to disempowered minority communities—*e.g.*, slaves and Indians—and those who evidenced disloyalty to the Government. *See id.* at 261–65; Churchill at 156–61. Many of these types of categorical restrictions were rejected by the Second Amendment but even those of arguable historical relevance do not "impose a comparable burden on the right" and are not "comparably justified" to § 922(g)(1)'s categorical disarmament of felons. *See Bruen*, 142 S. Ct. at 2133 (explaining metrics of comparing "relevantly similar" analogues).

*Bruen* also expressly rejected the type of overly generalized reasoning employed under the "virtuous citizen" theory. In *Bruen*, the

state of New York relied on a select few disparate historical restrictions on public carry of firearms for specific purposes or in specific sensitive places, to establish a more general principle of limiting all public carry. 142 S. Ct. at 2135, 2142–50. Throughout *Bruen*, the Court reasoned that the respondents had "define[d] the category … far too broadly," and rejected the extrapolation of a broad tradition from a few narrow historical restrictions. *See id.* at 2134, 2150, 2156. The same is true here. Historical evidence of disarming slaves, Indians, and political opponents cannot be generalized to encompass all "unvirtuous" people—a term that mischaracterizes those historical categories and which would encompass considerably more categories than felons. The term lacks a limiting principle and is defined "far too broadly." *See id.* at 2134; *cf. Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous … to delineate the scope of the Second Amendment"). It also invites deference to legislatures to define the "unvirtuous" people and reliance on something like means-end scrutiny for courts to review that definition. Both were repudiated by *Bruen*. 142 S. Ct. at 2131.

The "virtuous citizen" theory therefore lacks historical support and is insufficient to demonstrate an historical tradition of regulations "relevantly similar" to § 922(g)(1), as required by *Bruen*.

* * *

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g)(1) that would illustrate a tradition of categorically disarming felons. Thus, it cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126; *Range*, 69 F.4th at 106. *Bruen*'s new analytical framework plainly applies to § 922(g)(1) and renders the statute violative of the Second Amendment. The Court should therefore reverse the district court's denial of Banuelos's motion to dismiss and vacate his conviction.

## C. Under the same framework, § 922(g)(1) violates the Second Amendment as applied to felons like Banuelos.

In an as-applied *Bruen* challenge, as in a facial challenge, the Government must show that felons like Banuelos were historically disarmed. *See Daniels*, 77 F.4th at 340 (finding no historical tradition of "disarming a sober citizen" like Daniels "based exclusively on his past drug usage"); *Range*, 69 F.4th at 106 ("Because the Gov-

ernment has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."). This the Government has not done and cannot do.

As discussed above, there is no historical evidence to support the proposition that felons, dangerous or otherwise, were disarmed at the founding. *See United States v. Bullock*, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023), *appeal pending* No. 23-60408 (5th Cir.) ("The government's violent-and-dangerous argument is also out of sequence, as the government still had not (and has not today) proven the predicate question: that there is a historical tradition of disarming either the violent or the dangerous."). Courts are skeptical of subjecting § 922(g)(1) challenges to this type of ambiguous and unworkable dangerousness test. *See, e.g., id.* at *28; *Range*, 69 F.4th at 104 n.9 ("We need not decide [whether dangerousness or violence is the touchstone] today because the government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.").

Even if the Government could show a historical tradition of disarming dangerous felons, such a tradition would not support permanently disarming Banuelos because he does not have any violent felony convictions. *See* ROA.271–74; *Range*, 69 F.4th at 105-06 (holding § 922(g)(1) unconstitutional as applied to a non-violent felon). His criminal history consists of convictions for possessing between 50 and 2,000 pounds of marijuana, trespass, driving without a license, and speeding. *See* ROA.271–74.

Because the Government cannot show the requisite historical tradition, the Court should alternatively hold § 922(g)(1) unconstitutional as applied to Banuelos. *See Range*, 69 F.4th at 106.

## Conclusion

For these reasons, the Court should reverse the district court's denial of Banuelos's motion to dismiss and vacate his conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Bradford W. Bogan
BRADFORD W. BOGAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 7825
(210) 472-6700
(210) 472-4454 (Fax)
*Attorney for Defendant-Appellant*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,837 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Bradford W. Bogan
BRADFORD W. BOGAN
*Attorney for Defendant-Appellant*
Dated: January 16, 2024